Moore *v.* Williamson.

CHARLES B. MOORE and CHARLES E. MOORE and CHARLES B. ROBINSON, appellants,

*v.*

CHAUNCEY P. WILLIAMSON, respondent.

1. Where a claim is presented to an assignee for the benefit of creditors, which, for its sufficiency, depends upon the validity of a mortgage of property of the assignor as against his creditors, and exceptions to it are filed, which properly aver the mortgage to be void, as against those creditors, for fraud, the orphans court is the proper tribunal to hear the proofs and allegations of the parties and determine the question of fraud.

2. Such an assignee is regarded as the representative of the creditors, and, as such, may, for the benefit of creditors, set aside conveyances by the assignor in fraud of them, to the extent that property is needed for the payment of debts.

3. Where a mortgage is made with intent to defraud creditors, and the circumstances are such as should awaken the suspicion of the mortgagee and put him upon inquiry as to the intent with which the mortgage is made, he will be charged with notice of that intent.

4. Where a mortgage was executed for the purpose of defrauding the mortgagor's creditors, and was taken by a mortgagee with knowledge of that purpose, and to aid its execution, it is void as to those creditors, even though it be founded on a perfect consideration.

On appeal from a decree of the Somerset orphans court.

*Mr. George O. Vanderbilt* and *Mr. W. D. Holt,* for the appellants.

*Mr. George E. Pace* and *Mr. Alvah A. Clark,* for the respondent.

THE ORDINARY.

The decree appealed from overrules exceptions that were filed to a claim presented to the assignee of the property of William H. Gulick, for the benefit of his creditors.

By the disputed claim the respondent seeks to have paid to him the sum of $1,040, which he claims is secured by a chattel mortgage upon a portion of the assigned property. The assignee has sold the mortgaged chattels under an arrangement, with the appellee, that the moneys, realized from the sale, shall stand in the place of the chattels. Enough of money has been realized to pay the $1,040 in full.

The exceptions deny the validity of the mortgage on the ground that it was made for the purpose of defrauding the creditors of William H. Gulick. The exceptants are three of those creditors.

It is insisted in behalf of the respondent that the orphans court is without jurisdiction to declare the mortgage to be fraudulent and void.

By presenting a claim, against the estate of William H. Gulick, to the assignee, based upon, and supported by, the chattel mortgage, the respondent puts himself in a position where an attack upon his claim must of necessity be an attack upon his mortgage. The mode of attacking a claim of this kind is by exception, and the exception is to be heard and determined in the orphans court. *Rev. 38 § 6.* A fraudulent transfer is void at law as well as in equity. It is treated as a nullity everywhere, and a court of law takes cognizance of the fraud as well as a court of equity. *Mulford* v. *Peterson, 6 Vr. 127; Bump on Fraudulent Conveyances 529.* Where a claim is presented to an assignee for the benefit of creditors, which depends

32

for its sufficiency upon the validity of a transfer of property by the assignor as against his creditors, and exceptions to it, which properly aver the transfer to be void for fraud, are filed, it follows, that the orphans court is the proper tribunal to hear the proofs and allegations of the parties and determine the question of fraud.

It is further urged by the respondent, that the effect of the declaring the mortgage to be void, in this proceeding, will be to secure to the assignee the fruits of an action that he could not maintain. In other words, that the assignee stands in the place of the assignor and cannot question the validity of the mortgage, and that he should not be permitted by indirection to accomplish that which he cannot do directly.

The law is settled to the contrary in this State. The assignee is regarded as the representative of the creditors, and, as such, may, for the benefit of creditors, set aside conveyances by the assignor in fraud of them, to the extent that such property is needed for the payment of debts. *Pillsbury* v. *Kingon, 6 Stew. Eq. 287.* In this case much more than the moneys that this assignee will have, if this contract shall be decided in favor of the appellants, will be needed for the payment of the debts of his assignor. There is nothing in this objection to the proceedings.

Upon the question as to the validity of the chattel mortgage, I am of opinion that the mortgage was contrived in fraud to hinder and delay the creditors of William H. Gulick, and is consequently void under the statute. It is true the respondent and William H. Gulick and his son Willard, who were the parties concerned in making the mortgage, deny fraud, but the contradictions and improbabilities of their testimony so weakens my belief in their statements that I prefer to be controlled, in my decision, by inferences from established circumstances. Shortly before the execution of the mortgage William H. Gulick told Abraham S. Meyrick, who was afterwards made his assignee, that he was hopelessly insolvent and that he desired to adopt some method by which he could withhold part of his property from his creditors so that he would not be left destitute. He

insisted that there must be a way to accomplish it because others, in a similar situation, had successfully acted as he desired to act. He was told, by Mr. Meyrick, that his purpose was not honest.

Shortly after this interview with Meyrick, Willard Gulick, who was in his father's confidence, produced a bill against the father, which he and the father had made up, and consulted Mr. Meyrick as to the possibility of its collection, and was advised against urging it. The bill was based, mainly, upon services of the son to his father. The son became of age on August 20th, 1880, and was then living with his father. He had theretofore assisted his father upon the latter's farm, and thereafter he continued that assistance until April, 1882, when he went to Texas, to reside permanently. He was unsuccessful there, however, and, in June, 1883, returned to his father's house, where he resided until April, 1884, and then went upon a farm that he had purchased. After he returned from Texas he married, and his wife lived with him at his father's house.

The bill made up and presented to Mr. Meyrick charges the father, for his son's services, at the rate of $15 a month for seven months, to April, 1881, with $1,346.50, one-half the proceeds from the farm for the year ending April, 1882, and with eight months' work by the son and his wife, at $25 a month, to March 1st, 1884. It also charges for work done for the father after April 1st, 1884, for pasturage to the father's cattle, for milk sold, and for cash loaned to the father. Both father and son say that these charges are founded in contract entered into when the services were respectively rendered.

Neither the father nor the son appears to have kept any books of account or any memoranda by which the indebtedness of one to the other appears.

From their standpoint, it would appear that, although for the year from April, 1881, to April, 1882, the son was to have one-half of the proceeds of the father's farm in return for his labor, they did not keep any account of the sales from the farm, or of the expenses of its management. They say that the $1,346.50 charged in the bill, was ascertained from their recollection and

by reference to diaries that the father was accustomed to keep, and to grain bills that had been taken from millers when sales were made to them; but they also say that after the bill was made up, the diaries and grain bills were destroyed, so that now they have not even that data to support the bill. It appears that the father kept diaries for years, and, up to the time of making this bill, had preserved them. It seems unaccountable that when this bill was made they should have been destroyed, except it be that they would afford evidence of fraud. When the son went to Texas, it was necessary that he should have money for that purpose. He expected to settle permanently there. If his father then owed him for seven months' service and one-half of the proceeds of his farm for a year, why did he not ask for an accounting and payment? It is to be remembered that there were no accounts by which the year's business of the farm could be settled. That which he should be entitled to must, in a great measure, be determined from mere memory. Why should he go two thousand miles away, to reside permanently, without having, at least, ascertained the amount due to him? He needed money to settle in a strange country. Why did he not ask for that which he had earned? But the fact is, he did not ask for a settlement or for his money, and went away with little more than enough to pay the expenses of his journey. But why should he go to Texas, if at the age of twenty-two he had just made over $1,300 in one year? In 1884 he purchased a farm and stocked it, entirely on credit. When he went into this venture, if his claim be true, his father was indebted to him more than $1,500, yet he did not ask for payment or even for an accounting; and, although so much money was due to him, he gave a mortgage for the entire purchase-money of the farm he had bought, and his notes, for the stock and implements with which he operated that farm. Not only this, but afterwards, he increased the father's debt to him by doing further work for the father, pasturing his father's cattle, furnishing his father milk, and actually lending him a sum of money. It was not until December, 1884, when the father was contemplating an assignment for the benefit of his creditors, that a settlement was thought of between

the father and son, and it was not until then that this bill was made up. It was then that all means of verifying the claim, except by the oaths of the parties to it, were destroyed, and those oaths are of little practical value, because the persons who make them profess to forget most desirable particulars.

The disputed mortgage is based upon this bill of Willard Gulick against his father. Willard testifies that, when the claim was settled upon, the father was unable to pay it, and that he, Willard, refused to take a mortgage for it because he needed the money, and that, therefore, he and his father determined to procure a loan, so that cash might be paid to Willard. They made applications for the loan to several persons, without success, and then had recourse to the respondent. The respondent is of about the same age as Willard Gulick. At one time he boarded with William H. Gulick, and, while boarding with him, became, and has since continued to be, an intimate friend of Mr. Gulick's family; so intimate, indeed, that he has been considered and treated almost as if one of the family. Willard Gulick for years has been his constant companion and friend. When applied to, for a loan to pay Willard's bill, he had no money, but, nevertheless, agreed, he says, for a bonus of $40, to lend $1,040, by borrowing $400 from his sister and paying that sum in cash, and, at the same time, giving his note for $640, payable in ten days. He was to be secured repayment, of his loan, in sixty days, by the chattel mortgage in question, and he admits that he expected to be able to repay his sister, and to pay his note, out of the moneys that he would realize from the mortgage. It appears that after such arrangement, on the 12th of January, he went with Mr. Gulick and his son to a lawyer's office, where the mortgage was prepared. When the mortgage was executed the appellee made an affidavit, upon it, that its true consideration was $1,040, " loaned and advanced " to William H. Gulick, although at the time he made the affidavit he had not loaned or advanced any part of the $1,040. The next day Willard Gulick and the respondent went together to New Brunswick, where, they say, the respondent got $400 of his sister's money and paid it to Willard, who immediately gave the respondent the promised bonus of $40, out of the

$400 thus paid. The respondent then handed Willard his note for $640, payable to the order of William H. Gulick, ten days after date. The mortgage was dated January 2d, and recorded on January 14th, 1885. The remainder of the $400, that the respondent paid to Willard Gulick, was handed by Willard to his mother, the wife of William H. Gulick. Willard then gave credit for $1,000 paid on account of his bill, although in fact at that time he had not received a dollar for it. On the 22d of the same month, William H. Gulick executed an assignment for the benefit of his creditors to Abraham S. Meyrick, but the assignment was not recorded until the 28th of January. Two days before it was recorded, on the 26th of January, Willard Gulick and the respondent talked with Mr. Meyrick about the assignment, and on the 27th of the same month, Willard, at his father's house, where the respondent was, for the purpose, as he says, of getting his father's name out of the respondent's note, it having been endorsed by his father and handed to him, demanded payment of it. The respondent did not have any money to pay it, and, at the suggestion of Willard, asked Mrs. Gulick to lend him money for that purpose. Mrs. Gulick thereupon went through the form of lending him $640, by first counting out upwards of $300, from the moneys that had been used at New Brunswick, and then, when that sum had been paid over to Willard, by taking it back from Willard and counting from it to the respondent the amount necessary to complete the payment of the note. William H. Gulick was present at this ceremony. When it was concluded Mrs. Gulick took the money that had been used in it and put it away. The respondent then gave Willard a note for $640, payable to Willard's order, without interest, in three months from the note's date, and Willard endorsed the note in blank, to make it the property of his mother. Thus $400 paid the entire $1,040, so far as Willard and his father were concerned, and that $400 went to the hands of the mother evidently for the benefit, direct or indirect, of William H. Gulick. Although the respondent testifies that he borrowed the $400 from his sister, I am not entirely satisfied that he did so. The testimony of Mrs. Gulick indicates that the money may have been hers; that she

had accumulated it by savings from the sale of poultry and from gifts of friends. The disclosure of the double payment to make up the $640, is due to her testimony and her confession that it was resorted to because she did not have $640. The respondent, who was examined as a witness before her, sought to convey the impression that the $640 had been counted out at one time. The respondent, it is true, swears that he borrowed the money from his sister, but he is not corroborated, and, after reading his testimony, I place little faith in the truth of his statement. But whatever may be the truth of my surmise, it is clear the money used at New Brunswick ultimately went to Mrs. Gulick.

At this stage it becomes apparent that Willard did not need money for himself, and that his pretence that he would not take a mortgage because he wanted money was a mere subterfuge. It is evident that he feared to take a mortgage lest his bill should be attacked and thereby the consideration of the mortgage be shown to be a fraudulent claim. It was safer that he should appear to have been paid his bill by the money of a *bona fide* mortgagee. His lack of faith in the validity of his bill is still further evinced by the fact that the bill was never presented as a claim to the assignee, so that he might have a dividend on the balance in his favor, after the credit of $1,000.

After the new note was taken, nothing was done with it until August, 1885, after the respondent had been compelled to submit to examination in proceedings at law, for discovery, in aid of an execution upon a judgment against William H. Gulick. At that examination the respondent was asked whether he had paid the note of January 27th, and he refused to answer the question. Pending application to the judge, who made the order of discovery, to compel the witness to answer the question, another ceremony was performed whereby it was designed to make it appear that the respondent paid his note under compulsion. A lawyer, who had been employed by both the respondent and the Gulicks, wrote to the respondent that he must pay the note or be sued, and thereupon the respondent and Willard Gulick drove together to an adjoining county to see the respondent's brother, with the result that, in two or three days,

they and the brother called at the lawyer's office, and the brother gave his check for $640. An order was procured that the respondent should answer the question that he had refused to answer in the proceedings for discovery, and, in obedience to it, he answered that the note had been paid. The testimony does not develop whether the brother's check was paid, or, if paid, with what funds the payment was made.

I am not only satisfied that the bill of Willard Gulick against his father was fabricated to serve in a scheme that was devised to fraudulently withhold some portion of William H. Gulick's property from his creditors, but also that the respondent was brought into the scheme to appear as a *bona fide* mortgagee for value, and that the respondent knew of the fraudulent intent. By intimate friends he was offered $40 in addition to lawful interest, for $1,000 for sixty days, and ample security, consisting of almost all the stock and implements upon the borrower's farm. The extent of his financial ability was to borrow $400 from his sister. When he stated that to be its limit, he was urged to borrow the money, and told that his note, without interest, would be taken for the remainder of the loan, and that the mortgage should be dated and draw interest from the second of January, although executed on the twelfth of that month. He was told that the object of the loan was to pay the borrower's son $1,000, on account of a bill he had against his father, mainly for services. He knew that the son had lived as a member of his father's family; that he had been upon his father's farm but thirty months since he had become of age; that at best his services to the father had not been worth more than $500 above his board, and that his father had paid several hundred dollars for his expensive trip to Texas, besides the cost of his marriage. The bill itself exhibited a credit of nearly $550, and yet a balance of $1,336 in the son's favor. He also could see that the bill had remained unpaid for many months. What more natural than for him to inquire why such inducements should be offered to him for an act of friendship, and why it had suddenly become so important that his intimate friend and companion must have $1,000, and why, if the mortgage was to be paid in fifty days, his friend could not

Moore v. Williamson.

wait that time for payment of his bill. I think that the circumstances surrounding the application for the loan to the respondent, with the knowledge he had, were of such a character as to awaken his suspicion and put him upon inquiry as to the intent with which the mortgage was made, and charge him with notice of the intent to defraud. *Tantum* v. *Green, 6 C. E. Gr. 364.* The fact, that the respondent gave his note for $640, payable in ten days, when he knew that he would be absolutely without funds to pay it, and the fact, that he subsequently co-operated in two shallow devices to quiet conscience when it should become expedient to make oath that his notes had been paid, go far to convince me that he not only is chargeable with notice of the fraud that was perpetrated, but is also chargeable as an active and willing participant in it.

I have intimated that I doubt whether the respondent gave valuable consideration for the mortgage. It will not change my conclusion if he has done so. Having taken the mortgage, which was executed for a fraudulent purpose, with knowledge of that purpose, and to aid its execution, the mortgage is void against those who are defrauded by it (in this case the creditors of William H. Gulick), even though it be founded on a perfect consideration. *Green* v. *Tantum, 4 C. E. Gr. 105; S. C. on appeal, 6 C. E. Gr. 364; Schmidt* v. *Opie, 6 Stew. Eq. 138; Holt* v. *Creamer, 7 Stew. Eq. 181.*

The presiding judge of the orphans court dissented from the conclusion reached by the majority of that court. I agree with him that the mortgage is void.

The decree appealed from will be reversed, with costs.